1

2

3

4

5

6

7                       UNITED STATES DISTRICT COURT

8              FOR THE EASTERN DISTRICT OF CALIFORNIA

9

10   CONSERVATION CONGRESS,
                                        NO. CIV. S-13-0832 LKK/DAD
11            Plaintiff,

12        v.
                                             O R D E R
13   UNITED STATES FOREST
     SERVICE,
14
              Defendant.
15   _____/

16        On April 23, 2013, defendant U.S. Forest Service approved the

17   Mill Fire Salvage and Hazard Tree Removal Project (the "Project").

18   The Project calls for the Forest Service to, among other things,

19   conduct "salvage harvest" activities in the Blue Slides Late-

20   Successional Reserve ("LSR").   Plaintiff Conservation Congress,

21   concerned that the Project poses a danger to the Northern Spotted

22   Owl, filed this lawsuit under the Administrative Procedure Act

23   ("APA"), 5 U.S.C. § 702, asserting that the Forest Service approval

24   of the Project violated the National Environmental Policy Act

25   ("NEPA"), 42 U.S.C. §§ 4321-70h, and the National Forest Management

26

1

1   Act ("NFMA"), 16 U.S.C. §§ 1600-14.[1]

2       For the reasons that follow, the court will issue an

3   injunction and remand the matter to the Forest Service for further

4   action consistent with this opinion.[2]

5   **I.    STANDARDS - THE APA.**

6       Section 706 of the APA governs judicial review of agency

7   decisions under the NFMA and NEPA.  5 U.S.C. § 706.  Great Old

8   Broads for Wilderness v. Kimbell, 709 F.3d 836, 846 (9th

9   Cir. 2013), citing Native Ecosystems Council v. Dombeck, 304 F.3d

10  886, 891 (9th Cir. 2002).  This court affirms agency action "unless

11  it is 'arbitrary, capricious, an abuse of discretion, or otherwise

12  not in accordance with law.'"  Great Old Broads, 709 F.3d at 846

13  (quoting 5 U.S.C. § 706(2)(A)).

14      Here, the plaintiff asserts that the defendant violated the

15  law.  To resolve that issue, however, requires some examination of

16  _____

17      [1]  Plaintiff also asserts that the approval violates the
    Endangered Species Act, 16 U.S.C. §§ 1531-44, although the
18  complaint contains no separate cause of action alleging this
    violation.  Rather, the Complaint alleges that the failure to file
19  an Environmental Impact Statement assessing the impact of the ESA
    violation, which it says is required by the NEPA regulations, 40
20  C.F.R. § 1508.27(b)(10), is itself a violation of NEPA.

21      [2] The parties have previously sparred in this court over the
    fate of the spotted owl.  See Conservation Congress v. U.S. Forest
22  Service, 555 F. Supp. 2d 1093 (E.D. Cal. 2008) (enjoining the
    "Pilgrim Project" and remanding to the Forest Service)
23  (subsequently the injunction was dissolved, after the Forest
    Service addressed the deficiencies in the Environmental Impact
24  Statement, see Conservation Congress v. U.S. Forest Service, 2010
    WL 3636142 (E.D. Cal. 2010), aff'd mem., 489 Fed. Appx. 151 (9th
25  Cir. 2012); Conservation Congress v. U.S. Forest Service, 2012 WL
    2339765 (E.D. Cal. 2012) (denying motion to enjoin the "Mudflow
26  Project"), aff'd, Conservation Congress v. U.S. Forest Service,
    720 F.3d 1048 (9th Cir. 2013).

2

1   the history and administrative record.

2   **II.   THE ADMINISTRATIVE RECORD ("AR")[3]**

3    **A.   Background - The 2012 Mill Fire.**

4    The 2012 Mill Fire began on July 7, 2012, and was "contained"

5   on July 18, 2013.  <u>See</u> AR 4618 ("Burned-Area Report").  The fire

6   burned almost 30,000 acres, including 12,975 acres of forested

7   land,[4] and also including "part of the Blue Slides Late-

8   Successional Reserve (LSR) and 122 miles of off-highway vehicle

9   (OHV) trails and roads open to OHV use."  AR 146 (FONSI).[5] The LSR

10  is a "Management Area" that is managed under the Mendocino National

11  Forest Land and Resource Management Plan ("LRMP"), so as to

12  "protect and enhance late-successional forests to provide habitat

13  for populations of species dependent on late-successional forest

14  ecosystems, including the northern spotted owl."  AR 80 (Final

15  _____

16   [3] "Generally, judicial review of agency action is limited to
review of the record on which the administrative decision was
based."  <u>Thompson v. U.S. Dept. of Labor</u>, 885 F.2d 551, 555 (9th

17  Cir. 1989).  The Administrative Record consists of "all documents
and materials directly or <u>indirectly</u> considered by agency

18  decision-makers and includes evidence contrary to the agency's
position."  <u>Id.</u> (emphasis in text) (nested quotation marks

19  omitted).  The Forest Service moves to strike material submitted
by plaintiff outside the Administrative Record.  The court has

20  considered only material in the Administrative Record, and
accordingly the motion to strike, treated as an evidentiary

21  objection to the consideration of that material, will be granted.

22   The Administrative Record here consists of the original
Administrative Record, a Supplemental Administrative Record and a

23  Second Supplemental Administrative Record.  <u>See</u> ECF Nos. 9, 15
& 42.

24

25   [4] <u>See</u> AR 396.

26   [5] Of the burned acreage, 2,823 acres were in "Critical
Habitat."  AR 242 (BA).

1    Environmental Assessment).  "The fire created thousands of dead and
2    dying trees," which "have created hazardous conditions along
3    National Forest Service roads and OHV [Off-Highway Vehicle] trails
4    as these trees are expected to fall onto the transportation routes
5    in the coming years."  AR 80.

6         **B.   The Administrative Process.**

7              **1.   Burned Area Emergency Response ("BAER") Funding.**

8         In response to the fire, on July 25 and August 7, 2012, the
9    Forest Supervisor and the Regional Forester approved a funding
10   request for "emergency stabilization funds."  AR 4618-27.  Among
11   the stated objectives of the emergency response are to "[f]all
12   hazard trees in proposed treatment areas," and to "[c]onsider all
13   listed, sensitive and rare species in BAER actions."  AR 4624.

14             **2.   Scoping.**

15        In November and December 2012, the Forest Service sent
16   "scoping letters" to interested persons, notifying them that it had
17   proposed the "Mill Fire Salvage and Hazard Tree Removal Project,"
18   and inviting them to submit comments that the Forest Service
19   "should consider in assessing the environmental effects and making
20   a decision."  See AR 876-94 (scoping letters and e-mails) & 2988
21   (December 3, 2012 "Schedule of Proposed Actions").[6]  The scoping
22   letter was accompanied by the "preliminary project information,"
23   and "a map of the project area."  AR 870 ("Preliminary Project

24   _____

25        [6] "Scoping" is "an early and open process for determining the
     scope of issues to be addressed and for identifying the significant
     issues related to a proposed action."  40 C.F.R. § 1501.7.  A
26   Scoping Notice was published on November 17, 2012.  AR 3066.

1  Information") & 00875 (map).

2      In the Preliminary Project Information document, the Forest

3  Service discloses that it is proposing to "salvage" in the LSR to

4  meet several objectives.[7]  Among these objectives they assert are,

5  inter alia, that they seek to remove hazard trees so as to increase

6  public safety, to meet the need "to accelerate this habitat back

7  into conifer stands by reforestation to support late successional

8  species such as the spotted owl," as well as to avoid "high fuel

9  loading," and to avoid the loss of "economically salvageable

10  timber."  AR 872-73.

11      The Forest Service received letters and emails from 275

12  individuals and 15 organizations, including plaintiff Conservation

13  Congress, commenting on the proposed Project.  AR 2609-757,

14  2782-3056.  The Forest Service, according to its own interpretation

15  of "NEPA regulations," was required to assess these scoping

16  comments to determine which ones "raised issues, which did not, and

17  which of the issues raised were substantive."  AR 2314.[8]

18      Plaintiff Conservation Congress ("CC") submitted scoping

19  comments on December 15, 2012.  AR 2787-93 (CC comments and

20  incorporated Monica Bond article).  CC and others objected that

21  "The Forest should fully analyze logging effects on spotted owls

22  and their habitat (including Critical Habitat), disclosing direct,

23  ───────────────

24      [7] Each side uses its own jargon, apparently to influence the
argument in its favor.  Thus the Forest Service refers to the
removal of trees as "salvage," whereas plaintiff refers to the
25  removal of trees as "logging."

26      [8] Citing 40 C.F.R. § 1500.2(b) & 1500.4(g).

1  indirect, and cumulative effects."  AR 2324.[9]  The Forest Service

2  did not respond to this comment, labeling it a "Non-Issue Comment."

3  AR 2324 ¶¶ 72 & 73.  CC also objected that it had requested, but

4  never received, "a map documenting all past, present, and

5  foreseeable timber sales in the Blue Slide LSR," as that would

6  provide "a legitimate cumulative effects display of what is going

7  on in owl habitat ... within designated owl critical habitat and

8  LSR."  AR 2789.  The Forest Service does not appear to have

9  responded to this comment at all.[10]

10      Having concluded that all the CC scoping comments – along with

11  all the comments of all the other scoping commenters – were "Non-

12  Issue Comments," "Minor Comments," or did not merit labeling or

13  consideration of any kind, the Forest Service concluded that "no

_____

[9]  This is defendant's interpretation of CC's comments, combined with others.  It appears to be a fair interpretation, but CC itself actually wrote:

> While the scoping notice fails to mention it there is likely designated critical owl habitat in the both the project and analysis areas.  This information must be disclosed.  We encourage the Forest to prepare an EIS for this project since it is not based on any of the best available scientific information; the Forest should also consult with the USFWS regarding the owl. The Forest must also disclose any active or historic owl Activity Centers in the project/analysis area.

AR 2788.

[10]  In the Administrative Record submitted by the Forest Service, the comments the Forest Service responded to are marked with a paragraph number, corresponding to a paragraph in either Table 3 ("Non-Issue Comments") of Appendix C, or Table 4 ("Minor Issues") of the Forest Service's compilation of scoping comments. CC's "cumulative effects" comment was not marked with a paragraph number.  See AR 2789.

alternative to the proposed action" (other than the no-action alternative) needed to be developed or "analyzed in detail." AR 2344.

### 3. Consideration of Alternatives.

On February 12, 2013, the Forest Service completed its "Analysis of Economic Viability of Alternatives." AR 4599-605. The report considered the alternative of not salvage logging in the Blue Slides LSR, other than "roadside hazard trees along roads needed for management or recreation." AR 4601. The Forest Service rejected this alternative because, it concluded, it would result in a "deficit sale" which no one would be willing to bid on, and therefore "no action" would actually take place. Id.

### 4. Draft Silviculture Report.[11]

On February 13, 2013, District Silviculturist Chad J. Atwood and Certified Silviculturist Nancy Mulligan issued the draft "Silviculture Report." AR 3086. The report acknowledges that the Mendocino National Forest's Land and Resource Management Plan ("LRMP"), provides guidance for its salvage activities in the LSR. Specifically, the LRMP is intended to

> provide for the viability of the Northern Spotted Owl and other species dependent on older mature forested habitats .... Late-Successional Reserves (LSRs) are to be managed to protect and enhance conditions of late-successional and old-growth forest ecosystems, which serve as habitat for late-successional and old-growth

---

[11] The court does not here catalogue every draft and final report prepared by Forest Service personnel, of which there are many. The court briefly describes here only those reports that appear to bear directly on plaintiff's challenge to the proposed action.

1    related species including the northern spotted owl.
     These reserves are designed to maintain a functional,
2    interacting, late-successional and old-growth forest
     system.
3

4   AR 3089.  The draft report then sets forth the objectives of the

5   Project including, the removal of hazard trees, the restoration,

6   recovery and protection of "late seral species while at the same

7   time providing for future protection of late seral habitat in the

8   LSR," and "to recover the economic value lost in timber resources

9   in the Matrix areas."  AR 3088.

10      The draft report discusses how the Project would be carried

11  out, and describes its direct and indirect effects.  The report

12  states that the "no action" alternative would pose "direct and

13  unacceptable safety risks to the public and Forest Service

14  personnel who recreate and work" in the area.  AR 3110.  It would

15  also adversely affect the "establishment of late seral species in

16  the LSR" (such tree species being beneficial to the Northern

17  spotted owl and other species).  Id.  Finally, that alternative

18  would not permit the recovery of any economic value from the area.

19  Id.  The draft report states that the proposed action, on the other

20  hand, would have beneficial effects, including "reforestation with

21  late seral species."  AR 3111.[12]

22      The draft report also discusses "cumulative effects."

23  AR 3113-14.  This discussion makes reference to "[p]ast harvesting

24  and fuels treatment activities," but does not identify any specific

25  ────────────────

26      [12]  The "indirect effects" were variations on the themes
     expressed in the "direct effects."  AR 3111-13.

projects by name or location.  AR 3114.  It further states that
"[t]he proposed treatments would result in beneficial cumulative
effects at the landscape scale by reducing hazard trees, reducing
hazardous fuels, and reforesting these areas to late seral
species," and "will re-establish late seral species in the LSR."
AR 3114.

This discussion is pertinent because it seems to support
plaintiff's assertion that the Forest Service viewed the project
as being beneficial to the Northern spotted owl, at least
indirectly, by re-establishing the forest conditions necessary for
the owl to thrive, and by carrying out the objectives of the LMR,
namely to "provide for the viability of the Northern Spotted Owl."

### 5.  Draft Fuels Report.

On February 14, 2013, Fire Ecologist Rick Mowery issued the
draft "Fuels Specialist Report."  AR 2246.  Notably, in the section
discussing "projects with potential for cumulative effects," the
report states:

> [t]he Pacific Fuels project included 133 acres of timber
> harvest completed in 2012.  This project is the only one
> identified that overlaps units proposed for treatment as
> part of the Mill Fire salvage and hazard tree removal
> project.

AR 2257.  However, in discussing the cumulative effects, the report
notes that "[s]ome activities from this project [the Pacific Fuels
project] are still ongoing."  AR 2261.  The report further states:

> The Pacific Fuels Project treatments are not expected to
> change the rate of snags falling in the Mill Fire area,
> nor are they expected to affect the development of
> stands in the area.  The Pacific Fuels project, if
> completed, will provide a potential barrier to fire

1    movement into the area from the south.

2  AR 2261.

3        This discussion is notable because the final Fuels Specialist

4  Report contains no mention of the Pacific fuels project, at least

5  not by name.   The failure of the final report to mention that

6  project or analyze its cumulative effects on the Project is one of

7  the bases for plaintiff's challenge.

8              **6.   Draft Biological Assessment.**

9        On February 20, 2013, District Biologist Linda M. Angerer,

10 Forest Biologist Jim Ruhl and Forest Botanist Lauren W. Johnson

11 issued the draft Biological Assessment ("BA").   AR 2178.   The

12 purpose of the draft BA was "to determine whether the proposed

13 action may affect any of the threatened, endangered, or proposed

14 species listed below," including the "Northern spotted owl (Strix

15 occidentalis caurine) — Threatened."   AR 2180-81; see 50 C.F.R.

16 § 402.12(b)(1) (the Endangered Species act requires a biological

17 assessment for "[f]ederal actions that are major construction

18 activities").   In conducting its "species analysis," the report

19 begins by stating that the "Home Range" of the Northern Spotted Owl

20 is "an area of habitat within 1.3 miles radius" of an owl Activity

21 Center.   AR 2191.   An Activity Center is "the center of owl

22 activity based on detections during surveys or incidental

23 sightings."   Id.   The 1.3 mile radius is equal to a 2.09 kilometer

24 radius.

25 ////

26 ////

**a.    Distance of the project from Activity Center 3019.**

In describing the direct effects of the project, the draft BA states that "[o]nly one spotted owl home range overlaps with the project and Action areas."  AR 2192.  It appears that this refers to "Activity Center 3019," which is discussed in some detail in the draft.  <u>See</u> AR 2195.  The draft's acknowledgment that "one spotted owl home range overlaps with the project and Action areas" is particularly important to this litigation, because, as discussed more fully below, this court has previously held in recent litigation between these same two parties, that the <u>presence</u> of a threatened species in the project area triggers the Forest Service requirement to formally consult with FWS, <u>or</u> to obtain FWS "concurrence" with its "No Effect" determination.

In discussing the 3019 Activity Center, the draft BA asserts that the salvaging activity will take place "over 1km from the 3019 nesting site."  AR 2196.  The draft says that this is a relevant measure because the 1km distance is "further away from the nesting site than the burned areas used for foraging by California spotted owls reported by Bond et al (2009)."  <u>Id.</u>  As a result, the draft BA concludes that the project will have no effect on the spotted owl.  AR 2196.  This draft assessment is relevant to the case because, as discussed below, plaintiff challenges the Forest Service's conclusion that the spotted owl will not be affected so long as the project occurs outside a 1km radius of the 3019 Activity Center.

**b.    The Project's effect on the spotted owl.**

The Draft BA, at Exh. D, goes on to state that the proposed treatments:

> would re-establish stands of conifer.  Re-establishment of this habitat would strengthen the ability of the CH [Critical Habitat] to contribute to the provincial whole by accelerating spotted owl habitat suitability.

AR 2229.  The Draft BA goes on to make clear how the Project would benefit the spotted owl:

> The Mill Project is designed to start the process of restoring dry forest ecological structure, and processes and accelerating spotted owl habitat over the long-term. ...   Given the geographic location and the physical conditions of the Project area and its surroundings, active management to increase forest vegetation in the Project area is expected to contribute to the spotted owl's persistence and recovery.

AR 2232.

Summarizing its several comments on the effect of the project on the spotted owl and its habitat, the Draft BA concludes:

> Overall, the Mill Project is consistent with the land management objectives outlined in the 2011 Recovery Plan and is expected to provide a long-term benefit to the spotted owl without causing any significant short-term harm to the species.

AR 2233.

This part of the assessment is important to this case because plaintiff asserts that even if the Project has a beneficial effect on the spotted owl, that would trigger a Forest Service obligation to "consult" with the U.S. Fish and Wildlife Service about the Project.  As discussed below, the Forest Service erased the wording of the last quoted paragraph from the final Biological Assessment, asserting that its inclusion in the draft was a "cut and paste"

1  error.

2          **7.   Draft Environmental Assessment.**[13]

3          On February 22, 2013, the Forest Service issued a Draft

4  Environmental Assessment ("Draft EA") of the Project, and provided

5  an opportunity for the public to comment on it.   AR 2032.

6                  **a.   Proposed Action.**

7          The Draft EA establishes that the Forest Service is proposing

8  "[s]alvage harvesting" on "492 acres in units in the LSR Land

9  Allocation."   AR 2045.   The Forest Service predicts that the

10  proposed action would have "[m]inimal adverse effects to Blue

11  Slides LSR."   AR 2049.

12              **b.   Impact on the Northern Spotted Owl.**

13          According to the Draft EA:

14          Within the Mill Fire perimeter more than 65% of the
            existing suitable habitat for northern spotted owls was
15          burned at a moderate to high severity and no longer
            meets the definition of suitable nesting or roosting
16          habitat as described in the 2011 Revised Spotted Owl

17  _____

       [13]

18

19          NEPA requires that federal agencies prepare an
            Environmental Impact Statement ("EIS") for any "major
20          Federal actions significantly affecting the quality of
            the human environment."   42 U.S.C. § 4332(2)(C).   As a
21          preliminary step, an agency may first prepare a less
            exhaustive EA, which is a "concise public document" that
22          "[b]riefly provide[s] sufficient evidence and analysis
            for determining whether to prepare an [EIS]."   40 C.F.R.
23          § 1508.9(a).   If the agency concludes in an EA that the
            federal action will not have significant environmental
24          impacts, it may issue a Finding of No Significant Impact
            ("FONSI")   in   lieu   of   preparing   an   EIS.     Id.
25          §§ 1508.9(a)(1), 1508.13.

26  Center for Biological Diversity v. Salazar, 695 F.3d 893, 915 (9th
    Cir. 2012).

1   Recovery Plan and the 2012 Spotted Owl Critical Habitat
2   Designation.  Foraging habitat is the only habitat that
    remains functional.

3   AR 2038.  Thus, 35% of the spotted owl habitat remains, and it is

4   all foraging habitat.  Echoing the sentiment expressed in the

5   Preliminary Project Information, the draft EA specifically noted

6   the "need to re-forest this area back to its previous state and

7   help support sensitive or threatened species that rely on this type

8   of habitat such as the Northern Spotted Owl.  Reforestation would

9   accelerate these stands back into late successional habitat and

10  prevent the invasion of knobcone pine and other early successional

11  species."  AR 2039; <u>compare</u>, AR 872-73 (preliminary project

12  information statement about aiding the spotted owl).[14]

13      The Draft EA considered the benefits and adverse effects of

14  the Project.  Citing the "Mill Fire Salvage and Hazard Tree Removal

15  Project, Biological Assessment February 20, 2013" ("Draft BA"), the

16  Forest Service asserts that: "The project will benefit the LSR.

17  By treating the stands, beneficial forest species would be

18  reestablished and late successional habitat would be accelerated."

19  AR 2051.

20              **c.   Cumulative Impacts.**

21      The draft EA goes on to mention the "Pacific Fuels project"

22  as part of its consideration of "Whether the action is related to

23  other actions with individually insignificant but cumulatively

24  significant impacts."  AR 2053.  The cumulative impacts are

25  ───────────────

26      [14] Another stated value of re-forestation was "to return the
    deforested stands to timber producing lands."  AR 2040.

considered in the context of "fire and fuels."   The draft notes
that "[s]ome activities from this project are still ongoing," and
notes that one unit from the Pacific Fuels project "overlaps
proposed unit 17" of the proposed Project.   Id.

This discussion is of interest, because it disappears from the
Final EA, which makes no mention of the Pacific Fuels project.

### d.   Comments on the Draft EA.

The Forest Service received comments on the draft EA.   See
AR 90.   Plaintiff Conservation Congress ("CC") submitted lengthy
comments.   See AR 1078-117.   Among them:

(1)   The Forest Service asserted that no EIS
was required.   CC commented that Environmental Impact Statement was
required but not done.

(2)   The Forest Service included a "cumulative
impacts" section.   CC challenged that section as inadequate.

(3) The Forest Service asserts that it was not
required to consult with the U.S. Fish and Wildlife Service
("FWS"), because it had determined that the proposed Project would
have "no effect" on the spotted owl or its habitat.   CC challenged
this failure to consult, asserting that the Draft EA, and/or the
reports it relies upon, claims that the Project will "benefit" the
spotted owl, and that "any effect" on an endangered species,
including a beneficial one, requires a consult.

(4)   The Forest Service asserts that it will
not engage in logging within 1.0 kilometer of any spotted owl
nesting site, a distance it states is beyond the foraging habitat

according to "Bond et al. (2009)." CC commented that Bond, in the cited papers, specifically recommended that "post-fire logging be avoided within 1.5 kilometers (at least) of Spotted Owl nest sites." AR 1080-117.[15]

## 8. Request for Emergency Situation Determination.[16]

On April 8, 2013, Forest Supervisor Sherry Tune asked Regional Forester Randy Moore for an Emergency Situation Determination. AR 4574-75. The request (and its accompanying report) stated that the purpose of the Project was fourfold: "(1) provide for public and forest worker safety, (2) reduce future fuel loadings in the LSR, (3) facilitate conifer revegetation and (4) recover economic value from timber lost to the Mill Fire." AR 4585. The Forest

_____

[15] This last comment was written by the Director of the John Muir Project in a letter to CC, and was attached as an appendix to, and incorporated by reference into, CC's comments. AR 1099 ("All appendices are incorporated by reference into our comments in their entirety and are attached to these comments for FS reference").

[16] "Emergency situation – A situation on National Forest System (NFS) lands for which immediate implementation of all or part of a decision is necessary for relief from hazards threatening human health and safety or natural resources on those NFS or adjacent lands; or that would result in substantial loss of economic value to the Federal Government if implementation of the decision were delayed." 36 C.F.R. § 215.2. The Determination eliminates the automatic deferral normally applicable to such projects, and authorizes the Forest Service to implement the plan immediately after publication of the Decision Notice. 36 C.F.R. § 215.10(c)(1) (in an emergency situation, implementation may occur "[i]mmediately after publication" of the Notice); Lands Council v. Martin, 529 F.3d 1219, 1222 (9th Cir. 2008) (the Emergency Situation Determination "authorized immediate logging"). The declaration also apparently eliminates all administrative appeal rights the public might otherwise have. See Forest Service Employees for Environmental Ethics v. U.S. Forest Service, 408 F. Supp. 2d 916, 922 (N.D. Cal. 2006) (projects subject to an emergency declaration under Section 215.10 are among those exempted from administrative appeal provisions).

1  Supervisor argued that failure to issue an ESD would delay the sale

2  of the salvaged trees, making any such sale "less economically

3  viable," and causing existing threats "to safety and resources

4  caused by the fire" to remain in the project area for a longer

5  period of time.  AR 4575.

6      On April 9, 2013, the Regional Forester told the Chief of the

7  Forest Service that he concurred in the request to issue an

8  Emergency Situation Determination ("ESD") for the Project.

9  AR 4572-73.

10     In response, the Chief requested clarification on why the

11  Project should be approved in the Blue Slides LSR.  AR 4571.  In

12  response a "Briefing Paper" was prepared for the Chief.  See

13  AR 4568.  The Briefing Paper argues that "the purpose of the LSR's

14  is to provide for the viability of the Northern Spotted Owl and

15  other species dependent on older mature forested habitats." Id.

16  One "focus objective[]" of the Project, it went on, was "to

17  restore, facilitate the recovery of, and protect late seral species

18  while at the same time providing for future protection of late

19  seral habitat in the LSR." Id.  It concludes that the Project will

20  enable the project area to be "returned to stands of late seral

21  species to meet the objectives for the Blue Slides LSR." Id.  On

22  April 19, 2013, the Chief approved the ESD.  AR 4567;[17] 36 C.F.R.

23

24      [17]  The recited chronology of the Emergency Situation
Determination is the best the court can put together.  However,
25  there is some discrepancy in the Administrative Record between when
documents are described as having been written, and the dates
26  actually on the documents.

§ 215.2.

This correspondence is pertinent because it appears to show that the staff of the Forest Service highlighted the benefit to the LSR, and thus the indirect benefit to the spotted owl, as a basis for requesting the Emergency Situation Determination from the Chief of the Forest Service.

### 9.   Final Silviculture Report.

On April 11, 2013, District Silviculturist Atwood and Certified Silviculturist Mulligan issued the final "Silviculture Report." AR 392. It does not appear to differ in material respect from the draft report.

### 10.   Final Fuels Report.

On April 17, 2013, the Fire Ecologist (Rick Mowery), issued the final "Fuels Specialist Report." AR 349. Unlike the draft fuels report, the final fuels report contains no cumulative impact analysis of the Pacific Fuels project, and in fact makes no mention of that project.

### 11.   Final Biological Assessment.

On April 23, 2013, Grindstone Ranger District Biologist Linda M. Angerer issued the final "Biological Assessment" for the Project. AR 190.[18] The final report erases all direct references to the Forest Service's prior assertions that the Project would provide "long-term benefit to the spotted owl." For example, it removes that phrase entirely from its description of the overall

---

[18] The Grindstone Ranger District appears to be a district within the Mendocino National Forest.

18

1  effect of the Project.   Compare AR 2233 (draft) with AR 247
2  (final).  It also removes the term "spotted owl" from the paragraph
3  describing how the Project would accelerate "spotted owl habitat
4  over the long term," and replaces it with a statement that the
5  Project would accelerate "late successional habitat."   Compare
6  AR 2229 (draft) with AR 247 (final).[19]   Otherwise, the final
7  appears to be not materially different from the draft.

8              **12.  Final Environmental Assessment.**

9      On April 23, 2013, the Forest Service issued the final
10 Environmental Assessment ("EA").  AR 76.  This assessment, like the
11 draft, asserts that the Project would benefit the LSR.  AR 98.  It
12 also asserts, however, that the Project would have "NO EFFECT" on
13 the spotted owl's habitat.   AR 29.   The explanation for this
14 apparent contradiction is that the Assessment appears to equate the
15 concept of having "no effect" with the concept of having "no
16 adverse effect" on the habitat.  See AR 108 ("The Proposed Action
17 will not adversely affect critical habitat, as designated by the
18 2012 Critical Habitat rule. ...   Therefore, the Forest Service has
19 determined that the Project will not affect the species' critical
20 habitat").   It does not appear to consider the reality that having
21 a beneficial effect is not the same as having "no" effect.

22     The final Assessment's cumulative impacts analysis contains
23 no mention of the Pacific Fuels Project, a project mentioned in the

24

—————————

25        [19] The point of this latter air-brushing does not appear to be
   very effective, though, since "late successional habitat" is
26 spotted owl habitat.

1   cumulative impacts section of the draft.

2          **13.  Decision and FONSI.**

3          On April 23, 2013, the Forest Service issued a Decision Notice

4   ("Decision") and Finding of No Significant Impact ("FONSI"),

5   approving the Project.  AR 146-54.  Relying upon the Environmental

6   Evaluation ("EA"), AR 76, the Forest Service found that the Mill

7   Fire had created "thousands of dead and dying trees" which created

8   "hazardous conditions along National Forest Service roads and OHV

9   trails."  The hazard to the roads arises because "these trees are

10  expected to fall onto the transportation routes in the coming

11  years."  Id.  In addition, the dead and dying trees have created

12  a "fuel hazard[]" that is "expected to exceed the highest

13  recommended level in less than 5 years as the dead and dying trees

14  begin to fall."  Id.

15         The Forest Service concluded that "[a] salvage timber harvest

16  is needed to economically deal with the safety and fuel hazards

17  posed by the dead and dying trees," to "reduce fuels," and to

18  "prepare the sites for tree planting."  Id.

19             **a.   Response to Draft EA Comments.**

20         In responding to Comments received, the Forest Service

21  continued to buttress its earlier assertion that the Project would

22  at least indirectly benefit the spotted owl by helping to re-

23  establish its habitat.  For example, in response to a Comment

24  asking why the Forest Service had not done an Environmental Impact

25  Statement, it responded: "This project will accelerate the re-

26  establishment of the late successional conditions for which the LSR

20

1  was created."  AR 913.[20]

2      However,  immediately  following  its  acknowledgment  of  a

3  Conservation Congress comment stating that "any possible effect,"

4  even  a  beneficial  one,  required  a  consult  with  FWS,  AR 916-17

5  (Comment 34), the Forest Service disavowed its earlier reliance on

6  the Draft BA, which had stated that the Project "is expected to

7  provide  a  long-term benefit  to  the  spotted  owl."  AR 917 (Comment

8  35).   Indeed, the Forest Service states that its earlier assertion

9  of a benefit to the spotted owl was a "cut and paste error," and

10 that it has deleted the "misleading text."  Id.

11     The  Forest Service also rebutted the Comment assertion that

12 it had not considered "cumulative impact" by identifying sections

13 in  the  BA  where  cumulative  effects  are  discussed.   AR 915-16

14 (Comment 32).

15     The Forest Service did not respond to the comment that it had

16 mis-characterized "Bond et al. (2009)" by representing that Bond

17 stated that the spotted owl's foraging area did not extend beyond

18 1.0 kilometers of the nesting area, even though, the Commenter

19 asserted, Bond clearly indicated that the foraging area extended

20 to 1.5 kilometers beyond the nesting area.[21]

21  ───────────

22     [20] It is not clear that the Response adequately explains why
    no EIS was done, however.

23     [21] In its Motion for Summary Judgment, the Forest Service
24  curiously asserts that plaintiff "waived" this issue by not raising
    it in the comments.

25     The Forest Service asserts that it was free to choose from
26  several ranges specified in the literature.  Assuming that this is
    correct, it has no bearing on defendant's assertion that it was

1    Based upon these findings and conclusions, the Forest Service
2    determined that the salvage timber harvest would "best meet" its
3    goals under the Forest Plan (AR 5115), and under the Mendocino
4    National Forest ("MNF") Land and Resource Management Plan ("LRMP")
5    (AR 5268).  AR 147-48.  The Forest Service considered, in detail,
6    only the "No Action" alternative, and the proposed project.
7    AR 148.   Three alternative proposals "were considered but not
8    studied in detail."  Id.

9              **b.   FONSI.**

10   Based upon the EA, the Forest Service also concluded that the
11   Project "will not have a significant effect on the quality of the
12   human environment," and therefore determined that no EIS would be
13   prepared.  AR 149.

14   In deciding that there was no significant impact on the human
15   environment, and therefore no EIS was required, the Forest Service
16   made the following findings that are particularly relevant to this
17   lawsuit:

18              **(1)**  "The project will benefit the Blue Slides
19   LSR by treating some of the fire damaged stands to reestablish and
20   accelerate development of late successional habitat, as well as
21   reducing fuel hazard within those stands. (EA III.B.3)."  AR 150.
22              **(2)**  " ... the cumulative impacts are not
23   significant for any of the potentially affected resources (EA

24   ─────────────────
25   relying on Bond's statement for using the 1km range (and nothing
     else), and then mis-characterized Bond's statement.  Also,
26   defendant identifies no literature that indicates that it would be
     appropriate to log within 1.5 km from the nest site.

III.B.7)."  AR 151.

(3)  "The action will not adversely affect any endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species act of 1973, because the Proposed Action would not directly or indirectly affect spotted owls, their habitat, or their prey. ... (EA III.B.9)." AR 151-52.

(4)  "The action will not violate any Federal, State or local laws or requirements for the protection of the environment. ... (EA III.B.10)."  AR 152.

Thus, the Forest Service concluded both that the Project would benefit the Blue Slides LSR, the spotted owl's habitat, and also that it would not affect the spotted owl's habitat (directly or indirectly).

C.   Notice of Decision.

The Forest Service published a Notice of its decision on April 25, 2013, and notified interested parties of the decision by mail and email.  AR 3-43, 44, 45-56.

D.   Litigation.

On April 26, 2013, plaintiff served on defendant a "60-day notice to sue" under the Endangered Species Act ("ESA").  Original Complaint (ECF No. 1) ¶ 52; AR 67-72.  On April 29, 2013, plaintiff filed this lawsuit in federal district court.[22]  Plaintiff filed

---

[22]   Normally, plaintiff would have to exhaust its administrative remedies before filing suit.  See 7 U.S.C. § 6912(e) ("Notwithstanding any other provision of law, a person shall exhaust all administrative appeal procedures established by the

1   its First Amended Complaint ("Complaint") on June 4, 2013.   ECF

2   No. 18.

3        The Complaint alleges that the Forest Service violated NEPA

4   by failing to take the required "hard look" at the environmental

5   impacts of the proposed Project, and by failing to prepare a

6   required Environmental Impact Statement ("EIS").   The Forest

7   Service failed to take a "hard look," according to the Complaint,

8   by: (i) failing to engage in the required consultation, under the

9   ESA, with the U.S. Fish and Wildlife Service ("FWS") over the

10  effect the Project might have on the Northern Spotted Owl or its

11  habitat, directly or indirectly; and (ii) failing to consider the

12  "cumulative impacts" of the Pacific Fuels project on the proposed

13  Project.  The EIS was required, according to the Complaint, because

14  the Project involves logging within a Critical Habitat, within a

15  Late Successional Reserve, and even inside the "home range" of a

16  northern spotted owl.

17       The Complaint also alleges that the Forest Service violated

18  the NFMA by approving a Project that involves logging inside a Late

19  Successional Reserve, and inside the home range of a northern

20  spotted owl, without meeting the requirements for such logging,

21  _____

22  Secretary or required by law before the person may bring an action
    in a court of competent jurisdiction against ... an agency [or]
23  office ... of the Department").   The Secretary has established an
    administrative appeal procedure, and requires that it be followed
    before seeking judicial review.   See 36 C.F.R. §§ 215.8-215.21.
24  As discussed above however, it appears that the administrative
    appeal and exhaustion is waived when there is an Emergency
25  Situation Determination.   See 36 C.F.R. § 215.9 ("[e]xcept for
    emergency situations," implementation occurs on or after the 15th
26  business day following the date of appeal disposition).

24

1   imposed by the Mendocino National Forest Plan and the 2011 Recovery

2   Plan.

3        **E.   Technical Assistance.**

4        After the court heard oral argument on the cross-motions for

5   summary judgment, the Forest Service notified the court of

6   correspondence it had exchanged with the Fish and Wildlife Service

7   regarding its request for "Technical Assistance." ECF No. 31. The

8   parties have now briefed their conflicting views on whether this

9   constitutes "consultation" with FWS.

10  **III. ANALYSIS**

11       **A.   Claim One: NEPA.**

12       NEPA "requires federal agencies to take a 'hard look' at a

13  proposed project's environmental impacts." Western Watersheds

14  Project v. Abbey, 719 F.3d 1035, 1045 (9th Cir. 2013), quoting

15  Tillamook Cnty. v. U.S. Army Corps of Eng'rs, 288 F.3d 1140, 1143

16  (9th Cir. 2002). NEPA does not require any particular outcome, so

17  long as "the adverse environmental effects of the proposed action

18  are adequately identified and evaluated." Robertson v. Methow

19  Valley Citizens Council, 490 U.S. 332, 350 (1989). Other statutes

20  "may impose substantive environmental obligations on federal

21  agencies, but NEPA merely prohibits uninformed – rather than unwise

22  – agency action." Id.

23       For any agency proposal "significantly affecting the quality

24  of the human environment," the agency must prepare a detailed

25  statement of, among other things, the proposal's environmental

26  impact and alternatives to the proposal. 42 U.S.C. § 4332(C).

1  This "detailed statement" is called the Environmental Impact

2  Statement ("EIS"). Department of Transp. v. Public Citizen, 541

3  U.S. 752, 757 (2004).  Where the proposed agency action is neither

4  "categorically excluded" from the EIS requirement, nor "would

5  clearly require the production of an EIS," the agency must prepare

6  an Environmental Assessment ("EA") and use the EA to decide whether

7  to prepare an EIS.  Public Citizen, 541 U.S. at 757; 40 C.F.R.

8  § 1501.4(a)-(c).  If the agency determines that no EIS is required,

9  "it must issue a 'finding of no significant impact' (FONSI), which

10  briefly presents the reasons why the proposed agency action will

11  not have a significant impact on the human environment." Public

12  Citizen, 541 U.S. at 757-58; 40 C.F.R. §§ 1501.4(e), 1508.13.

13      Plaintiff alleges that the Forest Service's finding of no

14  significant impact resulted from its failure to take a "hard look"

15  at the Project, and that it was required to prepare an EIS.  It

16  bases its arguments on several assertions.  First, it asserts that

17  the finding of no significant impact is tainted by the Forest

18  Service's failure to consider the "cumulative effects" of the

19  proposed Project with other projects in the same area.  Second,

20  plaintiff asserts that a significant impact is threatened by the

21  Forest Service's failure to conduct the required consultation with

22  the Fish and Wildlife Service.

23          **1.  Failure to analyze cumulative effects.**

24      The Environmental Assessment is required to include a

25  discussion of the "environmental impact [impacts being "synonymous"

26  with effects] of the proposed action and alternatives."  40 C.F.R.

§ 1508.9(b).  Environmental impacts include "cumulative" impacts. Id., § 1508.8.  Finally:

> Cumulative impact is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

40 C.F.R. § 1508.7.  Accordingly, the EA is required to include an analysis of the cumulative effects of "past, present and reasonably foreseeable future actions" on the proposed project.  Kern v. U.S. Bureau of Land Management, 284 F.3d 1062, 1075 (9th Cir. 2002) (finding EA inadequate under NEPA because "it performs no cumulative impact analysis of 'reasonably foreseeable future actions'" outside the proposed project area); see also, NRDC v. U.S. Forest Service, 421 F.3d 797, 815 (9th Cir. 2005) (finding EIS inadequate for its failure to consider cumulative effects).

Plaintiff asserts that the EA fails to include a cumulative impact analysis of the Pacific Fuels project.

### a.  Waiver.

Defendant asserts that plaintiff waived the "cumulative effects" argument by not raising it in its comments.  This is simply incorrect.  Plaintiff's comments on the draft EA contain an entire paragraph focused on its concerns about "all past, present, and foreseeable timber sales in the Blue Slide LSR," and noting that the Forest Service had failed to provide a map showing this:

27

1    Conservation Congress requested a map documenting all
     past, present, and foreseeable timber sales in the Blue
2    Slide    LSR,    which    ironically    is    considered
     "non-functioning".   We also requested an overlay of any
3    portion of the analysis area (LSR) that is designated
     critical habitat.    This map provides a legitimate
4    cumulative effects display of what is going on in owl
     habitat since the majority of large timber projects
5    occur in the Grindstone RD and within designated owl
     critical habitat and LSR. The Forest refused to provide
6    such a map so we will be filing a FOIA along with these
     comments.
7

8    AR 2789.   While CC's comments do not mention the Pacific Fuels

9    project by name, that cannot constitute a waiver.   It is up to the

10   Forest Service to discuss the cumulative effects of other projects;

11   it is not up to CC or anyone else to somehow discover other

12   projects that the Forest Service should have mentioned and

13   analyzed.   In any event, CC here clearly disclosed its concerns

14   about cumulative effects, and was attempting to get a map from the

15   Forest Service that would enable it to identify prior projects.

16   Also, the unexplained nature of the Pacific Fuels treatment

17   discussions which appears in the Draft BA, but disappears from the

18   Final BA, and which appears in the Draft Fuels Report, but

19   disappears in the Final Fuels Report, would relieve plaintiff of

20   any obligation to identify and seek information about this other

21   project by name.

22       Plaintiff complained in the comments that defendant did not

23   discuss the cumulative effect of other projects.   There is no

24   waiver.

25   ////

26   ////

1              **b.   Analysis of cumulative effects.**

2        The draft EA does contain a discussion of the "Pacific Fuels

3   project" in the Cumulative Effects section.  <u>See</u> AR 2053.  Oddly,

4   the discussion does not state whether or not the Pacific Fuels

5   project will have any cumulative effects.  This is particularly odd

6   because the other projects mentioned in this section – Little Stony

7   Project, Trough Fuelbreak project, Board Camp project, and "Road

8   brushing" – all include statements about what cumulative effect,

9   if any, those projects would have on the proposed project.

10  AR 2053-54.[23]

11       The strangeness continues into the Final EA, because the

12  discussion of the Pacific Fuels project, and of all the other

13  projects appearing in the Cumulative Effect section of the Draft

14  EA, simply disappears.  Discussion of those projects is replaced

15  by a statement that "Cumulative effects were analyzed and

16  documented in the Fuels Specialist Report [April 17, 2013]."

17  AR 101.  Meanwhile, the Fuels Specialist Report contains no

18  discussion of any cumulative effects of the Pacific Fuels project,

19  nor any other named project.  <u>See</u> AR 349-73.  The Fuels report's

20  Cumulative Effects section discusses only "cumulative" effects of

21  the proposed project, it contains no discussion of the Pacific

22  Fuels project, nor any other project other than the proposed Mill

23

24  ─────────────

25       [23] "Plantation maintenance," also included in the Cumulative
    Effects section, says nothing specifically about cumulative
    effects, but it states that there are no maintenance activities
26  planned for the proposed project area.  AR 2054.

                                   29

1   Fire project.   AR 364.[24]   The Draft Fuels Specialist Report

2   (AR 2246), did discuss the Pacific Fuels project specifically, but

3   like the Draft EA, it did not draw a conclusion about the project's

4   cumulative effects.  Like the Draft EA, its discussion of the other

5   projects does contain conclusions about the cumulative effects of

6   those projects.

7        In short, as best the court can tell, the Forest Service did

8   not examine whether any cumulative effects would arise from the

9   Pacific Fuels project.  If it did effectively examine cumulative

10  effects, it did not disclose its analysis in the draft EA, the

11  final EA, the draft Fuels Specialist Report or the final Fuels

12  Specialist Report.

13       In response to plaintiff's challenge, the Forest Service

14  argues:

15       Table 5 of the biological assessment identifies "past
         thinning and fuels treatments" and shows that 421 acres
16       of thinning took place in 2011.  AR-00199.  The Pacific
         Fuels Project, while not mentioned by name, is this
17       thinning from 2011 and is included in the aggregate
         baseline for past treatments for the Mill Fire Project.
18       See AR-05530 (2010 DN/FONSI for the Pacific Fuels
         Project, stating that "approximately 470 acres [of
19       authorized activities] are within the Blue Slides LSR.")

20  Opposition at 24 (emphasis added).[25]  In other words, this single

21

22       [24] Neither side addresses what significance the court is to
    make of the now-you-see-it, now-you-don't aspect of Pacific Fuels
23  project discussion.

24       [25] The Forest Service does not explain what it is talking
    about, but it appears that "environmental baseline" is a concept
25  from the ESA, meaning "past and present impacts of all Federal,
    State, or private actions and other human activities in the action
26  area."  50 C.F.R. § 402.02.

reference in the biological assessment is defendant's entire cumulative effects analysis of the Pacific fuels project. Defendant cites cases that permit the agency to aggregate <u>past</u> projects rather than enumerate each of them by name.  <u>See</u> <u>Center for Environmental Law and Policy v. U.S. Bureau of Reclamation</u>, 655 F.3d 1000, 1007 (9th Cir. 2011) ("An agency may, however, characterize the cumulative effects of past actions in the aggregate without enumerating every past project that has affected an area"); <u>League Of Wilderness Defenders Blue Mountains Biodiversity Project v. Allen</u>, 615 F.3d 1122, 1136 (9th Cir. 2010) (confirming that "the Forest Service may aggregate its cumulative effects analysis pursuant to 40 C.F.R. § 1508.7").

There is much wrong with the Forest Services' argument. First, the use of this "aggregate" procedure refers only to "past" activities.  Defendant cites no case stating that <u>current</u> activities overlapping the proposed project may be considered in the aggregate with past activities.  The draft Fuels Specialist Report disclosed that the Pacific Fuels Project "overlaps units proposed for treatment as part of the Mill Fire salvage and hazard tree removal project," and that "[s]ome activities from this project [the Pacific Fuels Project] are still ongoing."  AR 2261. Although the Forest Service later removed this language from the Fuels Specialist Report, it never disavowed it, or indicated that it was inaccurate in any way.  The court concludes that the Forest Service's attempt to use the "aggregate" procedure in this case is not supported by the cases it cites.

1    Second, even if they are "aggregate," the cumulative effects

2  must be included in the <u>Environmental Assessment</u> (or the EIS if one

3  had been prepared). 40 C.F.R. § 1508.9 ("Environmental Assessment

4  ... [s]hall include brief discussions ... of the environmental

5  impacts of the proposed action and alternatives"); <u>Center for</u>

6  <u>Biological Diversity v. Salazar</u>, 695 F.3d 893, 917 (9th Cir. 2012)

7  ("An EA also "must fully assess the cumulative impacts of a

8  project'"). The court knows of no law, regulation or case that

9  permits the Forest Service to hide this discussion anywhere other

10  than where the public expects to find it.  In fact, the draft

11  Environmental Assessment does contain a "Cumulative Effects"

12  section, but that section contains no analysis at all of the

13  cumulative effects of the Pacific Fuels Project – individually or

14  in the aggregate with other projects.

15    Third, the draft environmental assessment mis-directs the

16  reviewing public's attention by stating that the Cumulative Effects

17  analysis can be found in the Fuels Specialist Report.  However,

18  that report also contains <u>no discussion</u> of the cumulative effects

19  of the Pacific Fuels Project – individually or in the aggregate

20  with other projects.  Now, in litigation, the Forest Service

21  discloses that the cumulative effects are discussed in the draft

22  BA.[26]  Of course, this disclosure comes too late.  The draft

23  environmental assessment is intended to inform the public, not mis-

24

25    [26] However, the EA does not incorporate the draft BA (or the
   final BA) by reference, and it does not inform the reviewing public
26  that the cumulative effects analysis can be found in the draft BA.

32

1 direct them until a lawsuit is filed.

2     Fifth, even if the reviewing public were required to search
3 every page of every environment document the Forest Service
4 produced in connection with this Project, it would not find a
5 "Cumulative Impacts" section in the draft biological assessment,
6 where the Forest Service now says it can be found.

7     Sixth, even if the reviewing public figured out that the
8 biological assessment did refer to the Pacific fuels project
9 (although not by name) in the section entitled "PAST ACTIONS that
10 have led to current conditions," AR 2185, it still would find no
11 analysis of the effect of the past project, whether individually
12 or in the aggregate with other projects.  The Past Actions section
13 of the draft BA only discloses that there was "thinning" in the
14 "Action area" in 2011.

15     Seventh, the Forest Service's own regulations call for more
16 explicit discussion of cumulative effects than defendant has done
17 here.  See 36 C.F.R. § 220.4(f).  The regulations require the
18 agency to assess "the extent that the effects of the proposal for
19 agency action or its alternatives will add to, modify, or mitigate"
20 the effects of "past actions."  Id.  Nothing in the EA or the BA
21 does this.  Thus, even an "aggregate" disclosure must still analyze
22 the effects of the past actions on the current project and the
23 environment, not simply note that they occurred.

24     **2.   Flawed finding of no significant impact (FONSI).**

25     The Mill Fire burned 2,823 acres of Critical Habitat.  AR 242.
26 "Of the 985 acres within the project area proposed for salvage tree

33

removal, 534 acres are in Critical Habitat." AR 243.  The Forest

Service made its determination of No Significant Impact based upon

ten (10) factual findings.  AR 149-52.  Plaintiff challenges

principally the ninth finding (Finding "I"):

> The action will not adversely affect any endangered or
> threatened species or its habitat that has been
> determined to be critical under the Endangered Species
> act of 1973, because the Proposed Action would not
> directly or indirectly affect spotted owls, their
> habitat, or their prey.

AR 151.

This finding was based upon Section III(B)(9) of the EA.

AR 152.  Section III(B)(9) of the EA reports on "[t]he degree to

which the action may adversely affect an endangered or threatened

species or its habitat that has been determined to be critical

under the Endangered Species Act of 1973." AR 106.  This Section

of the EA acknowledges that "[a]pproximately 2 percent of Activity

Center #3019 home range is proposed for treatment."  AR 107.

However, the EA finds, critically to the outcome of this case, that

"Nesting Roosting and Foraging habitat would not be treated."  Id.

(emphasis added).

The finding that the spotted owl's foraging habitat would not

be treated, like the rest of Section III(B)(9) of the EA, is based

entirely upon the BA.  AR. 107.[27]  The BA, in turn, determined that

---

[27] "A Biological Assessment ["*The Mill Fire Salvage and Hazard Tree Removal Biological Assessment, April 23rd, 2013*"] was prepared to review the proposed Mill Fire Salvage and Hazard Tree Removal Project in sufficient detail to determine whether the proposed action may affect any of the threatened, endangered, or proposed species listed below."  AR 107.

1  for a forest to support the spotted owl, it must contain:

2  (1) nesting and roosting habitat; (2) foraging habitat; and

3  (3) dispersal habitat.  AR 240-41.[28]

4      As for the Project's possible impact on the spotted owl's

5  foraging habitat, the BA cites "Bond et al (2009)" for the

6  proposition that "[o]wls may forage in areas of moderate to high

7  burn severity <u>within 1 km</u> of their nest site."  AR 210 (emphasis

8  added).[29]  Because, according to the Forest Service, "[a]ll units

9  are <u>over 1 km</u> from the 3019 nesting site," they are therefore

10 "further away from the nesting site than the burned areas used for

11 foraging by California spotted owls reported by Bond et al (2009)."

12 AR 210.[30]  As a result of their 1 km or greater distance from the

13 nesting site, the BA concludes, "these treatments will have no

14 affect [sic] on spotted owls."  AR 210.

15     Plaintiff challenges this critical finding, asserting that

16 "Bond found that owls typically used areas up to 1.5 kilometers

17 away from the nest."  Plaintiff's Motion for Summary Judgment

18 ("PSJ") (ECF No. 17) at 22.

19              **a.  Waiver.**

20     The Forest Service asserts that plaintiff "waived" its

21

22     [28]  The BA found that "[n]o nesting/roosting habitat remains
   within the fire boundary."  AR 242.  It also found that "[t]he

23 remaining trees treatment units do not meet the guidelines for
   dispersal habitat."  AR 243-44.

24     [29]  The Forest Service also found that "the units are
25 surrounded by moderate to high severely burned areas."  <u>Id.</u>

26     [30]  It further found that "[f]oraging habitat (540 acres) that
   survived the fire exists outside of the salvage units."  AR 243.

1    complaint about its alleged mis-characterization of the Bond report

2    by failing to raise this issue in the comments to the EA.

3    Plaintiff's comments consisted of twenty (20) pages of its own

4    comments, signed by the Executive Director of CC.   AR 1080-99.

5    However, the comments also included four appendices that were

6    "incorporated by reference into our comments," listed as appendices

7    at the end of CC's comment letter, and "attached to these comments

8    for FS reference." AR 1099.   The first of these appendices was a

9    letter to CC from Dr. Hanson of the John Muir Project, which

10   recites that "[y]ou [Denise Boggs, ED, Conservation Congress]

11   requested that I review the Draft Environmental Assessment (DEA)

12   for the proposed "Mill Fire Salvage and Hazard Tree Removal

13   Project" on particular issues pertaining to forest/fire and

14   wildlife ecology."

15       Dr. Hanson expressly states: "Bond et al. (2009) specifically

16   recommended that post-fire logging be avoided within 1.5 kilometers

17   (at least) of Spotted Owl nest sites."   This comment is sufficient

18   to raise the issue with the Forest Service.

19              **b.   The finding of no effect on foraging habitat.**

20       In 2009, Monica L. Bond and others published "Habitat Use and

21   Selection by California Spotted Owls in a Postfire Landscape" (The

22   Journal of Wildlife Management).   AR 3393-401.   This is the article

23   the Forest Service cited to support its finding of no impact on

24   foraging habitat.[31]   The article reported on a study of seven (7)

25   ──────────────

26       [31] In litigation, the Forest Service now robustly attacks the
     Bond article.   The issue however, is not what the Forest Service

                                      36

1  "California spotted owls," and how their foraging was affected by

2  a fire.  The writers found that the probability that "any" of the

3  seven owls would use a site for foraging "was greatest when the

4  site was burned and was located <u>within approximately 1 km</u> of a nest

5  or roost center."  AR 3398 (emphasis added).  However, for five out

6  of the seven owls, the "strongest selection for foraging areas was

7  in high-severity burned forest <u>within 1.5 km</u> from the center of

8  their foraging ranges."[32]  <u>Id.</u> (emphasis added).  Later, in its

9  "Management Implications" section, the writers state:

10      California spotted owls whose territories included
11      unburned and burned Sierran mixed-conifer forest of low-
        to high severity made use of all burn severities, with
12      high probability of foraging in burned areas, including
        high severity, <u>within 1.5 km</u> of nests or roosts, and
13      selectively roosted in low severity burned areas.

14  AR 3399 (emphasis added).  Thus, the article can only be read to

15  say the foraging range of the spotted owl, as best as can be

16  derived from the observation of these seven owls, is "within 1.5

17  km of nests."[33]  The article's description of the 1 km distance,

18  _____

19  attorneys currently think of the article now that their client is
    in litigation.  The issue is whether the Forest Service itself
20  relied on the Bond article in concluding that the Project would
    have "no effect" on the spotted owl, and it did.  The Forest
21  Service says that there were other articles involved in their
    decision.  That may be so, but what the Forest Service disclosed
22  in the Administrative Record was a reliance on the Bond article,
    not on any other articles for this point.

23      [32] As best the court can tell, the writers appear to use
24  "center of their foraging ranges" as another way of describing the
    nest site.

25      [33] Indeed, the Bond article states in its Abstract, and
26  repeats in its conclusion:

according to the article itself, is where the "probability" of
finding an owl engaged in foraging is "greatest."  AR 3398.  As
best the court can tell, the 1 km distance does not define where
the foraging range ends, but only where within the foraging range
the owl is most likely to be found.[34]

The BA plainly mis-uses the Bond article.  The Draft BA
states: "Owls may forage in areas of moderate to high burn severity
within 1 km of their nest site (Bond et al 2009)."  AR 2196.  While
this statement is literally true, it is also true that, according
to "Bond et al 2009," owls may forage in areas of moderate to high
burn severity within 1.5 km of their nest site.  However, the BA
then uses its cramped reading of the Bond article to give
significance to its statement that "[a]ll units are over 1 km from
the 3019 nesting site."  AR 2196.

The BA then concludes: "Thus, the units are further away from
the nesting site than the burned areas used for foraging by
California spotted owls reported by Bond et al (2009)."  This
conclusion is simply wrong.  The burned areas used for foraging by

_____

We recommend that burned forests within 1.5 km of nests
or roosts of California spotted owls not be
salvage-logged until long-term effects of fire on
spotted owls and their prey are understood more fully.

[34] In the same way, scientists might find that the "greatest
probability" of finding a 21st Century human being is within seven
feet of a television set.  But that would not mean that the human
habitat extended only those seven feet.  Rather, it would mean that
within the human habitat (which might extend as many as fourteen
feet from the television), the mostly likely place to find the
human is within the first seven feet.

1  California spotted owls – at least as reported by "Bond et al
2  (2009)" – are 1.5 km from the nest site.   Therefore, the BA's
3  reliance on the location of units being more than 1.0 km from the
4  nest site, provides no support for the conclusion that the foraging
5  areas – those between 1.0 km and 1.5 km from the nesting site – are
6  not affected.

7      This finding is one of the two bases for the Forest Service's
8  conclusion that the proposed Project would have "no effect" on the
9  spotted owl.   Since the underlying finding is fatally flawed, the
10 court must reject the conclusion drawn from it.[35]   This conclusion,
11 in turn, is the basis for the Forest Service's determination that
12 it was not required to prepare an EIS.[36]

13      **3.   Failure to consult with FWS and failure to obtain**
14      **FWS "concurrence."**

15      As noted above, the Forest Service is required to prepare an
16 EIS if the Project would "significantly" affect "the quality of the
17 human environment."   "Significantly" in this context includes,
18 among other things, consideration of whether the action threatens
19 a violation of federal environmental law.   40 C.F.R. § 1508.27(10).
20 Accordingly, if the Forest Service's proposed action threatens to

21      [35] The Forest Service does not assert that the two underlying
22 bases for the "no effect" conclusion were each independently
   sufficient to support the conclusion.

23      [36]   This 0.5 kilometer difference matters, because the Forest
24 Service apparently is of the view that it can begin logging
   operations on areas that are more than 1.0 kilometers from the nest
25 site, but less than 1.5 kilometers from the site.   That would be
   logging in the spotted owl's forage habitat, according to Bond.
26 However, the Forest Service has not made any determination of how,
   or whether, that would affect the spotted owl or its habitat.

1  violate federal environmental law – including the Endangered

2  Species Act – an EIS is required.   It follows that failure to

3  prepare an EIS in this situation violates NEPA.[37]   Plaintiff

4  asserts that the Forest Service violated the ESA by approving a

5  project without consulting with FWS even though the project would

6  affect – beneficially or otherwise, and directly or indirectly –

7  the Northern spotted owl.

8                    **a.   Consultation requirement.**

9       The Endangered Species Act:

10          requires federal agencies, such as the Forest Service,
            to "insure that any action authorized, funded, or
11          carried out by such agency ... is not likely to
            jeopardize the continued existence of any endangered
12          species or threatened species or result in the

13  _____

14       [37] Although the argument seems a bit clever, it does provide
     a way out of a conundrum the law otherwise creates.  Namely,
15   plaintiff could not file an ESA claim until it had given the Forest
     Service a 60-day notice of suit.   This would allow the Forest
16   Service time to conduct whatever consultation it should have done
     in the first place, or to otherwise comply with the ESA.   Those 60
17   days might not normally pose any problem for the plaintiff, since
     the plaintiff normally can defer the proposed action by filing its
18   administrative appeal.  Here, however, the project was subject to
     an "emergency" declaration, which permits the Forest Service to go
19   forward with the project immediately, and without any action-
     deferring administrative appeals process.   Thus, the conundrum is
20   that in this case, plaintiff could file its 60-day notice (in fact,
     it has), but the project could be over and done with by the time
21   it could file the ESA claim.  Plaintiff's interpretation of
     Section 1508.27(b)(10) prevents this from occurring, by nesting its
22   ESA claim within NEPA.

23       Defendant understandably protests this use of NEPA to assert
     an ESA claim.  However, it cites no case law prohibiting plaintiff
24   from proceeding in this way.  Moreover, as best the court can tell,
     NEPA, as interpreted in the governing regulations, plainly permits
25   plaintiff to do so.  See 40 C.F.R. § 1508.27(b)(10) (federal action
     can have a "significant impact" on the human environment if it
26   threatens a violation of federal environmental law).

1
2
3
4
5

> destruction or adverse modification of [critical] habitat of such species." 16 U.S.C. § 1536(a)(2). Procedurally, before initiating any action in an area that <u>contains</u> threatened or endangered species, federal agencies <u>must consult with the FWS</u> (for land-based species) or the National Marine Fisheries Service (for marine species) to determine the likely effects of any proposed action on species and their critical habitat.

6  <u>Conservation Congress v. U.S. Forest Service</u>, 720 F.3d 1048, 1051

7  (9th Cir. 2013) (emphasis added).  Thus, "consultation" with FWS

8  is required regardless of whether the Forest Service believes that

9  its project will or will not affect the spotted owl or its habitat.

10 So long as the spotted owl is present, a consult is required.  The

11 only issue here then, is whether that consult must be "formal," or

12 can be "informal."

13     A "formal consultation" with FWS is required <u>unless</u>:

14
15
16

> (1) an agency determines that its action is unlikely to adversely affect the protected species or habitat, <u>and</u> (2) the relevant Service (FWS or NMFS) concurs with that determination.

17 <u>Conservation Congress v. U.S. Forest Service</u>, 2012 WL 2339765 (E.D.

18 Cal. 2012) (Karlton, J.) (emphasis added), <u>aff'd</u>, 720 F.3d 1048.

19 Here, the Administrative Record reveals no evidence of a "formal"

20 consultation with FWS, and the Forest Service does not assert that

21 it has engaged in one.  Accordingly, the remaining question is

22 whether the FWS has engaged in "informal" consultation with FWS

23 that resulted in FWS's "concurrence" with the Forest Service.

24
25

> **b.   Defendant did not consult with FWS nor obtain its "concurrence."**

26     After oral argument on this matter, the Forest Service

1   submitted to the court correspondence it had conducted with the
2   Fish and Wildlife Service, without comment. <u>See</u> ECF No. 31.  The
3   court received briefing from the parties on the significance of
4   this correspondence.  Unsurprisingly, the Forest Service seems to
5   assert that the correspondence is evidence that it has informally
6   consulted with FWS, while plaintiff asserts that it shows no such
7   thing.  The significance of the correspondence is buried beneath
8   nearly impenetrable bureaucratic language.  As best the court can
9   interpret it, however, it does not amount to informal consultation
10  with FWS.  Even if it did, the Forest Service is required to obtain
11  FWS "concurrence" in the Biological Assessment, which it has not
12  done.

13       On June 17, 2013, in response to plaintiff's filing of this
14  lawsuit, the Forest Service wrote to FWS requesting "technical
15  assistance regarding the potential effects of ... [the Project] on
16  the northern spotted owl." ECF No. 31-2 at 2-7.  FWS responded on
17  July 3, 2013, with a letter expressing its confusion over what the
18  Forest Service was requesting.  ECF No. 31-2 at 8.  FWS advised the
19  Forest Service of its choices.  First, if the Forest Service
20  determined that the Project would have "no effect" on the spotted
21  owl, then FWS's concurrence "is neither required nor appropriate."
22  Second, if the Forest Service believed the Project "may affect" the
23  spotted owl, then the Forest Service must first make that
24  determination, and then "request concurrence from the Service
25  <u>through the informal consultation process</u>" (emphasis added).
26  Third, and "[a]lternatively," the Forest Service could request

1  "technical assistance regarding the scientific soundness" of its
2  analysis" (emphasis added).

3       The Forest Service chose the last alternative, which,
4  according to both the Forest Service and the FSW, was distinguished
5  from the consultation process.  Specifically, the Forest Service
6  stated that it understood that its earlier letter was confusing
7  "since it requested both technical assistance related to our No
8  Effect determination as well as a concurrence related to the
9  possibility of a May Affect, Not Likely to Adversely Affect
10  determination."  ECF No. 31-2 at 9.  The Forest Service then
11  clarified that it sought, not consultation and not a concurrence,
12  but "your input on the scientific basis for our determination."
13  The Forest Service asked FWS to construe the June 17th letter "as
14  a request for technical assistance regarding the scientific
15  soundness of the analysis in the Project's Biological Assessment
16  prepared for the Project."  In other words, the Forest Service had
17  already determined – without consultation with or concurrence from
18  FWS – that the Project would have "No Effect" on the spotted owl.
19  The court presumes that the Forest Service could have said that it
20  was reconsidering that determination, or that it had withdrawn the
21  determination pending consultation with FWS, but it did not do so.
22  Rather, the Forest Service sought something called "technical
23  assistance," which it recognized expressly was distinct from
24  "informal consultation."

25       The court concludes, based upon the Administrative Record, and
26  documents recently filed by the Forest Service, that the Forest

43

1  Service has still not engaged in informal (or formal) consultation

2  with FWS.

3      Moreover, even if the correspondence submitted by the Forest

4  Service does amount to "informal consultation," it did not result

5  in the required "concurrence" of FWS.   FWS made clear in the

6  correspondence that it could give a concurrence, <u>or</u> it could give

7  technical assistance.   Since the Forest Service clarified that it

8  sought only technical assistance, that is what FWS gave.

9              **c.    Whether the Project will "affect" the Northern**
              **Spotted Owl.**

10

11     Even  if  the  specific  spotted  owl  resident  in  Activity

12  Center  3019  does  not  exist,  as  defendant  implies,[38]  informal

13  consultation followed by FWS "concurrence" is still required if the

14  Forest  Service  is  to  avoid  formal  consultation.   That  is  because

15  the  administrative  record  shows  that  defendant  justified  the

16  Project and the Emergency Situation Determination by asserting that

17  the Project will <u>benefit</u> the spotted owl and/or its habitat.

18     The  Endangered  Species  Act  ("ESA")  imposes  a  duty  on  an  agency

19  to consult with the FWS when any discretionary agency action "may

20  affect" a listed species or designated critical habitat.   <u>Karuk</u>

21  <u>Tribe of California v. U.S. Forest Service</u>, 681 F.3d 1006, 1027

22  (9th Cir. 2012) (finding the Forest Service had a duty to consult),

23

24     [38] Notwithstanding the Administrative Record evidence showing
   that the Northern Spotted Owl is a "threatened" species that is
25  present in Activity Center 3019, the Forest Service has offered
   mostly footnoted statements that no spotted owl has been seen in
26  the area for the past ten years.

1  cert. denied, 568 U.S. ___, 133 S. Ct. 1579 (2013).   Even a

2  beneficial effect on the species or habitat "triggers the

3  requirement."   Id.

4       Plaintiff finds much support for its view in the draft and

5  final documents the Forest Service issued.   Echoing the sentiment

6  expressed in the Preliminary Project Information, the draft EA

7  specifically noted the "need to re-forest this area back to its

8  previous state and help support sensitive or threatened species

9  that rely on this type of habitat such as the Northern Spotted Owl.

10 Reforestation would accelerate these stands back into late

11 successional habitat and prevent the invasion of knobcone pine and

12 other early successional species."   AR 2039; compare, AR 872-73

13 (preliminary project information statement about aiding the spotted

14 owl).[39]

15      The Draft EA considered the benefits and adverse effects of

16 the Project.   Citing the draft BA, the Forest Service states: "The

17 project will benefit the LSR.   By treating the stands, beneficial

18 forest species would be reestablished and late successional habitat

19 would be accelerated."   AR 2051.   The Draft BA, at Exh. D, in turn,

20 states that the proposed treatments:

21          would re-establish stands of conifer.   Re-establishment
            of this habitat would strengthen the ability of the CH
22          [Critical Habitat] to contribute to the provincial whole
            by accelerating spotted owl habitat suitability.
23

24 AR 2229.   The Draft BA goes on make clear how the Project would

25  ─────────────────────

26      [39] Another stated value of re-forestation was "to return the
    deforested stands to timber producing lands."   AR 2040.

1  benefit the spotted owl:

2          The Mill Project is designed to start the process of
        restoring dry forest ecological structure, and processes
3       and accelerating spotted owl habitat over the long-term.
        ...   Given the geographic location and the physical
4       conditions of the Project area and its surroundings,
        active management to increase forest vegetation in the
5       Project area is expected to contributed to the spotted
        owl's persistence and recovery.

6

7  AR 2232.

8          Summarizing its several comments on the effect of the project

9  on the spotted owl and its habitat, the Draft BA concludes:

10         Overall, the Mill Project is consistent with the land
        management objectives outlined in the 2011 Recovery Plan
11      and is expected to provide a long-term benefit to the
        spotted owl without causing any significant short-term
12      harm to the species.

13 AR 2233.

14         After plaintiff pointed out to the Forest Service that "any

15 effect" on the spotted owl, even a direct or indirect "benefit,"

16 would require preparation of an EIS, the Forest Service removed

17 from the Final EA its previous conclusion, set forth in the Draft

18 EA, that the project would benefit the spotted owl.  However, the

19 Forest Service continued to make assertions about the project that

20 could lead to only one conclusion: the Forest Service's goal was

21 to benefit the spotted owl and/or its habitat; and the Forest

22 Service believes that the Project will have that effect.

23         Throughout the Forest Service's various reports, the Forest

24 Service asserted and pointed to evidence that the proposed Project

25 would benefit the spotted owl, at least indirectly, by benefitting

26 its habitat.  The Forest Service first issued a Preliminary Project

46

1    Information document, which notes that among the goals of the

2    project are to remove hazard trees so as to increase public safety,

3    and to meet the need "<u>to accelerate this habitat back into conifer</u>

4    <u>stands by reforestation to support late successional species such</u>

5    <u>as the spotted owl</u>."  AR 872-73 (emphasis added).  Taking action

6    that will "accelerate" the recovery of habitat specific to the

7    spotted owl appears to be at least an indirect benefit to the

8    spotted owl.

9         The Final EA, in explaining the "need" for the Project,

10   explains:

11        <u>Reforestation in the Blue Slides LSR</u>

12        • Existing conditions threaten substantial delay in the
     recovery of mature and old growth forest conditions on LSR lands.
13   Approximately 1,9007 acres of mixed conifer forest land in the LSR
     was burned into a deforested condition.
14
          • Loss of late successional habitat creates a need to re-
15   forest this area back to its previous state and help support
     sensitive or threatened species that rely on this type of habitat
16   such as the Northern Spotted Owl.  Reforestation would accelerate
     these stands back into late successional habitat and prevent the
17   invasion of knobcone pine and other early successional species.

18   The EA further states (AR 98-99):

19        The Blue Slides Late Successional Reserve (LSR) is
          located in the project area and could be considered an
20        ecologically critical area.  The LSRs are designed to
          maintain a functional, interacting, late-successional
21        and old-growth forest ecosystem (LRMP, p. IV62).  The
          project will benefit the LSR.  By treating some of the
22        fire-damaged stands, beneficial forest species would be
          reestablished and development of late successional
23        habitat would be accelerated as well as reducing fuel
          hazard within those stands.
24
25        In addition, a document prepared by Jim Ruhl, Forest Wildlife

26   Biologist (December 2009) (AR 5383), and included in the

                                      47

1   Supplemental Administrative Record, discusses the foraging habitat

2   of the spotted owl. MNF Management Indicator Species Revised

3   Habitat Capability Models (December 2009) (AR 5383-5464).

4   According to the report, spotted owls have a "nest site" (or

5   "activity area"), a "core habitat," and a "home range." The core

6   habitat is generally within approximately 0.5 miles

7   [0.8 kilometers] of the nest site. AR 5387 at ¶ II(B)(1) ("Core

8   Habitat"); AR 204 (BA). However, "[h]abitat beyond the core area

9   is also important." AR 5388 at ¶ II(B)(1). Specifically,

10  according to this 2009 report, the "home range" is defined – after

11  the Forest Service's consultation with the U.S. Fish and Wildlife

12  Service – "as a 1.3 mile [2.09 kilometer] radius circle around an

13  activity center. And they establish a **post-action threshold** of at

14  least 1336 acres of combined nesting, roosting, and foraging

15  habitat within the circle." AR 5391 at ¶ II(B)(2) ("Home Range")

16  (emphasis in text); AR 204 (BA).[40] The report goes on to state:

17      Projects that remove nesting, roosting, and/or foraging
        habitat but remain at or above 1336 acres within the
18      home range are assigned a finding of "may affect but not
        likely to adversely affect".

19

20  Id. (emphasis in text). This language appears to be saying that

21  the Forest Service should have made a finding of "may affect" if

22  it will conduct logging within 2.09 kilometers (1.3 miles) of a

23  nesting site. Such a finding compels the Forest Service to consult

24  _____

25      [40] Finally, the BA states that the "Outer Ring" is "an area of
    habitat within the 1.3 mile radius but excluding the Core (2,880
26  acres)." AR 204.

1  with FWS about this project, but it failed to do so.

2      Indeed, consulting with FWS would have alerted the Forest

3  Service that according to the Revised Recovery Plan, spotted owls'

4  foraging habitat extends 1.5 kilometers (not 1.0 kilometers) past

5  the nest or roost site:

6          Results from the three radio-telemetry studies of
           spotted owls in post-fire landscapes indicate that
7          spotted owls use forest stands that have been burned,
           but generally do not use stands that have been burned
8          and logged.  For example, California spotted owls
           tracked 4 years post-fire in burned, unlogged stands:
9          ... selected low-, medium-, and high-severity burned
           forests for foraging within 1.5 km of the nest or roost
10         site, with the strongest selection for high-severity
           burned forest (Bond et al. 2009).

11

12  AR 4754 (FWS "Revised Recovery Plan for the Northern Spotted Owl,"

13  June 28, 2011).

14      **B.   Claim 2: NFMA.**

15      "Under the NFMA, 'after a forest plan is developed, all

16  subsequent agency action, including site-specific plans such as the

17  [Project], must ... be consistent with the governing [forest

18  management] plan.'"  <u>Sierra Forest Legacy v. Sherman</u>, 646 F.3d

19  1161, 1188 (9th Cir. 2011), <u>quoting</u> <u>Lands Council</u>, 537 F.3d at 989.

20  The governing forest plan for the Mendocino National Forest is the

21  "Land and Resource Management Plan, Mendocino National Forest."

22  AR 5046-114.   The Forest Plan apparently incorporates the

23  "Standards and Guidelines for Management of Habitat for

24  Late-Successional and Old-Growth Forest Related Species Within the

25  Range of the Northern Spotted Owl."  AR 5115-267 ("For those

26  National Forests without approved Forest Plans (Klamath,

Shasta-Trinity, Six Rivers, and Mendocino), these standards and guidelines apply directly to management activities, and will be incorporated into Forest Plans as they are developed").

### 1.   Removal of fire-damaged, non-hazard trees.

Under "Guidelines for Salvage" in the section regarding "Late-Successional Reserves," the Forest Plan provides:

> Salvage is defined as the removal of trees from an area following a stand-replacing event such as those caused by ... fires. Salvage guidelines are intended to prevent negative effects on late-successional habitat, while permitting some commercial wood volume removal. In some cases, salvage operations may actually facilitate habitat recovery. For example, excessive amounts of coarse woody debris may interfere with stand regeneration activities following some disturbances. In other cases, salvage may help reduce the risk of future stand-replacing disturbances. While priority should be given to salvage in areas where it will have a positive effect on late-successional forest habitat, salvage operations should not diminish habitat suitability now or in the future.

AR 5177. It goes on as follows:

> Surviving trees will provide a significant residual of larger trees in the developing stand. In addition, defects caused by fire in residual trees may accelerate development of structural characteristics suitable for associated species. Also, those damaged trees that eventually die will provide additional snags. <u>Consequently, all standing live trees should be retained, including those injured (e.g., scorched) but likely to survive.</u>

AR 5178 (emphasis added). Plaintiff asserts that in violation of this plan, the Forest Service's proposal would remove non-hazardous standing trees "that have an equal chance of living or dying from effects of the fire. AR 000564."

Even assuming plaintiffs' facts are correct, and they appear to be, these facts do not show a violation of the Forest Plan. The

1   proposal will mark non-hazardous trees for removal only if they are

2   "fire-damaged," and have "a 0.5 or higher probability of

3   mortality." AR 564. In other words: (1) if a tree is likely to

4   die, it can be logged; (2) if a tree's chances of survival are

5   50-50, it can be logged. There is nothing in the Forest Service

6   proposal that permits logging of a tree that is "likely to

7   survive."

8       Plaintiff asserts that the trees subject to logging are not

9   "hazard trees" at all. According to the LSR Assessment:

10      Hazard trees are defined as those trees which are dead
        or are predicted (using the best available science) to
11      die within six months; and which are likely to fall on
        roads, structures, administrative sites, and/or
12      recreation sites given their height and position.

13  AR 5014. Plaintiff objects that the proposal allows the Forest

14  Service to remove non-hazard trees even if they won't die for three

15  years. Plaintiff's argument appears to be that a tree can be

16  logged only if it is a hazard tree, that is, it is predicted to be

17  dead within six months.[41] However, the Forest Plan does not say

18  this. It says that fire-damaged trees should be retained if they

19  are "likely to survive." Logically, that must mean that they are

20  likely to survive for, essentially, as long as they would have if

21  there had been no fire. There is nothing in the Plan that

22  indicates that a fire-damaged tree's survival time must be less

23  than six months in order to be logged.

24  _____

25      [41] Also, the proposal does not say that only hazard trees
    would be removed. It says that "potential hazard trees" would also
26  be removed, and it says that trees would be removed for "fuel
    reduction."

1          **2.    Inventory and monitoring.**

2          Plaintiff asserts that the Forest Service has not conducted

3    "'necessary   inventory   and   monitory   activities   to   determine

4    population densities and habitat trends within each area' for the

5    spotted owl."  Motion at 31, citing AR 5085.  This fact, even if

6    it  is  true,  does  not  support  plaintiff's  assertion  that  the

7    challenged proposal will violate the Forest Plan.  If the Forest

8    Service is independently not carrying out some part of the Forest

9    Plan, perhaps plaintiff can sue over that, but it has nothing to

10   do with this lawsuit, which is a challenge only to the proposed

11   plan.

12   **IV.   CONCLUSION**

13         The Forest Service's approval of the Project violated NEPA by

14   failing  to  take  the  required  "hard  look"  at  the  Project's

15   environmental impact.  First, the Forest Service failed to consider

16   the  cumulative  impacts  of  prior  projects,  together  with  the

17   proposed Project, on the environment.  If it did consider these

18   impacts, it failed to disclose them in the environmental documents

19   filed as part of the Administrative Record.

20         Second, the Forest Service failed to engage in the required

21   consultation with FWS about the Project's possible impact on the

22   Northern Spotted Owl.  This failure is a violation of the ESA, the

23   environmental impact of which must be disclosed in an Environmental

24   Impact  Statement.   Of  course,  it  would  appear  that  the  more

25   sensible route is not to disclose and discuss the law violation,

26   but rather to comply with the ESA.

1      For all the reasons discussed above, the court orders as
2  follows:

3          1.   Plaintiff's motion for summary judgment on the NEPA
4  claim is **GRANTED.**  Defendant is hereby **ENJOINED** from carrying out
5  any actions pursuant to the Project, other than those already
6  approved by this court.   The matter is **REMANDED** to the Forest
7  Service so that, if it wishes to proceed with the Project, it can
8  consult with FWS on how the Project would affect the Northern
9  Spotted Owl and its Critical Habitat, and unless it obtains the
10 required "concurrence" from FWS, for the preparation of an
11 Environmental Impact Statement;

12         2.   Defendant's motion for summary judgment on the NEPA
13 claim is **DENIED;**

14         3.   Defendant's motion for summary judgment on the NFMA
15 claim is **GRANTED**, and plaintiff's motion for summary judgment on
16 the NFMA claim is **DENIED.**

17         4.   Defendant's motion to strike (ECF No. 22), treated
18 as an evidentiary objection, is **GRANTED.**

19     IT IS SO ORDERED.

20     DATED:  September 6, 2013.

21

22

23                              LAWRENCE K. KARLTON
24                              SENIOR JUDGE
                                UNITED STATES DISTRICT COURT
25

26